UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER YVON,<br><br>                                        Plaintiff,<br><br>v.<br><br>CITY OF OCEANSIDE, a California<br>Municipal Corporation,<br><br>                                        Defendant. | Case No.:  16-CV-1640-AJB-WVG<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>(Doc. No. 3) |

Presently before the Court is Plaintiff Christopher Yvon's ("Yvon") motion for preliminary injunction.[1] (Doc. No. 3.) Defendant City of Oceanside ("City") opposes the motion. (Doc. Nos. 5, 10.) Having reviewed the parties' arguments and controlling authority, and pursuant to Local Civil Rule 7.1.d.1, the Court finds the matter suitable for decision on the papers, without oral argument. The Court **GRANTS** Yvon's motion.

<u>**BACKGROUND**</u>

Yvon is an individual seeking the City's approval to operate a tattoo studio at 609

---

[1] Yvon filed his motion as an *ex parte* application for temporary restraining order ("TRO") and for an order to show cause regarding preliminary injunction. (*See* Doc. No. 3.) On July 8, 2016, the Court denied the application to the extent Yvon sought a TRO, but otherwise construed it as a motion for preliminary injunction. (Doc. No. 9.)

Vista Way in Oceanside, California. (Doc. No. 1 ¶¶ 1, 9.) The location where Yvon seeks to open his studio is governed by the substantive provisions of the 1986 Zoning Ordinance and the administrative provisions of the 1992 Zoning Ordinance. (Doc. No. 5-3 ¶ 14.) Section 1500 of the 1986 Ordinance ("CUP regulation") requires persons seeking a business license to operate a tattoo business in Oceanside to obtain a conditional use permit ("CUP"). (*Id.* ¶ 10.) Yvon alleges that this regulation grants City officials unbridled discretion in determining whether to grant or deny a permit. (*Id.* ¶ 11.) Yvon further alleges the City does not require a CUP decision to issue within a specified brief period of time. (*Id.* ¶ 12.) For these reasons, Yvon alleges the CUP regulation constitutes an unconstitutional prior restraint. (Doc. No. 3-1 at 9–13.)

Because tattooing is classified as a "regulated use" by section 1500.21 of the 1986 Ordinance, criteria in addition to the CUP regulation are imposed. (Doc. No. 1 ¶ 12.) Specifically, section 1500.23 imposes a location restriction on regulated uses, requiring such businesses to be at least 200 feet from residential properties and 1000 feet from any other regulated uses ("buffer zone regulation"). (*Id.* ¶ 13.) Yvon alleges this regulation is an impermissible time, place, and manner restriction. (Doc. No. 3-1 at 13–15.)

Yvon alleges that his counsel contacted the City on November 24, 2015, requesting that he be allowed to open a tattoo shop without first applying for a CUP.[2] (Doc. No. 1 ¶ 14.) John Mullen, an attorney for the City, called Yvon's counsel informing him that while the City would not require Yvon to obtain a police permit, he would be required to obtain a CUP. (*Id.*) In mid-June 2016, the City's planning division issued a staff report recommending that Yvon's CUP be denied. (*Id.* ¶ 15.)

Yvon alleges that the reasons given in support of the recommendation do not meet First Amendment requirements. (*Id.*) Because of the City ordinances, Yvon alleges he has

---

[2] The City provided the Court with a copy of this letter. (Doc. No. 10-4 at 4–8.) Contrary to Yvon's allegation, his counsel did not seek a waiver of the CUP regulation, but rather sought a waiver of the police permit regulation and the cap on tattooing establishments in the City. (*Id.*)

suffered the loss of his right to free speech as well as income he cannot earn due to his current inability to operate a tattoo business in the City.[3] (*Id.* ¶ 16.) Yvon thus instituted this action by filing the operative complaint, bringing claims under 42 U.S.C. § 1983 for deprivation of his rights guaranteed by the First and Fourteenth Amendments of the United States Constitution, as well as deprivation of his right to free speech guaranteed by Article 1, Section 2 of the California state constitution. (*Id.* ¶¶ 17–23.)

Yvon filed the instant *ex parte* application on June 29, 2016. (Doc. No. 3.) The Court permitted the City an opportunity to oppose the application, which it did on July 5, 2016. (Doc. No. 5.) On July 6, 2016, Yvon filed a reply. (Doc. No. 6.) The Court denied Yvon's *ex parte* application to the extent he sought a TRO, but otherwise construed the application as a motion for preliminary injunction. (Doc. No. 9 at 3–4.) The Court permitted both sides an additional opportunity to further brief the propriety of this injunctive relief, which they did. (Doc. Nos. 10, 11.)

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and is "never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). To obtain this relief, the moving party bears the burden of demonstrating four factors: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id.* at 20 (citations omitted).

Although a plaintiff must satisfy all four of the *Winter* requirements, the Ninth Circuit employs a sliding scale whereby "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

---

[3] Yvon states this loss of income is due to his inability to practice tattooing in the City of Long Beach. (Doc. No. 1 ¶ 16.) The Court assumes he intended to say "City of Oceanside."

3

Accordingly, if the moving party can demonstrate the requisite likelihood of irreparable harm and show that an injunction is in the public interest, a TRO may issue so long as there are serious questions going to the merits and the balance of hardships tips sharply in the moving party's favor. *Id.*

**DISCUSSION**

## I.    *Likelihood of Success on the Merits*

The Ninth Circuit recently made clear that all aspects of tattooing are purely expressive activity entitled to the full protection of the First Amendment: "The tattoo *itself*, the *process* of tattooing, and even the *business* of tattooing are not expressive conduct but purely expressive activity fully protected by the First Amendment." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010) (emphasis in original). However, activity protected by the First Amendment may still be subjected to constitutional time, place, and manner restrictions. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49–50 (1986); *see also 3570 E. Foothill Blvd., Inc. v. City of Pasadena*, 912 F. Supp. 1268, 1273 (C.D. Cal. 1996) ("despite the fact that adult entertainment is protected by the First Amendment, local governments do have the right to impose time, place, and manner restrictions").

Yvon challenges two provisions of the 1986 Ordinance and seeks an injunction preventing the City from enforcing them: (1) the buffer zone regulation, which requires all regulated uses, including some constitutionally protected activities like tattooing, to be at least 200 feet from any residential property and 1000 feet from any other regulated use; and (2) the CUP regulation, which requires an applicant to show, *inter alia*, that the proposed use "will not . . . be detrimental to the health, safety, peace or general welfare of persons residing or working in the vicinity." (Doc. No. 5-12 at 3.)

### A.    **Yvon's Standing to Facially Challenge the Ordinances**

As an initial matter, Yvon argues he has standing to facially challenge the ordinances, notwithstanding his pending application. (Doc. No. 3-1 at 8–9.) Though the City does not dispute this contention, the Court is "under an independent obligation to

4

examine [its] own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

Having reviewed Yvon's position and controlling legal authority, the Court agrees that Yvon has standing to facially challenge the ordinances. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755–56 (1988) ("our cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license" (citing *Freedman v. Maryland*, 380 U.S. 51, 56 (1965))); *Forsyth Cnty., Ga., v. Nationalist Movement*, 505 U.S. 123, 129 (1992) ("It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation[.]"); *Dease v. City of Anaheim*, 826 F. Supp. 336, 340 (C.D. Cal. 1993) ("Plaintiff has standing to challenge the ordinance, regardless of whether she has applied for or would qualify for the CUP").[4]

## B.   Buffer Zone Regulation

"The power of local governments to zone and control land use is undoubtedly broad

---

[4] The City argues that because Yvon brings a facial challenge to the buffer zone and CUP regulations contained in the 1986 Ordinance, he must show that the regulations are "unconstitutional in every conceivable application[.]" (Doc. No. 10 at 8–9 (quoting *Lone Star Sec. & Video, Inc.*, 2016 WL 3632375, at *3 (9th Cir. 2016).) The City argues Yvon cannot make this showing because the 1986 Ordinance is not unconstitutional in every possible application. (*Id.* at 9.) The Court's response is simple: It is. As explained *infra*, Yvon has carried his burden in showing a likelihood of success on whether the buffer zone regulation is an impermissible time, place, and manner restriction because the City has failed to proffer pre-enactment evidence tying the alleged secondary effects of tattooing businesses with its substantial government interest in implementing the 1986 Ordinance. *See infra* Discussion Section I.B. Similarly, Yvon has carried his burden in showing a likelihood of success on whether the CUP regulation is an unconstitutional prior restraint for vesting unbridled discretion in City officials. *See infra* Discussion Section I.C. Enforcing each of these regulations based on these findings renders them unconstitutional in every application.

and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities. But the zoning power is not infinite and unchallengeable; it 'must be exercised within constitutional limits.'" *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981) (quoting *Moore v. E. Cleveland*, 431 U.S. 494, 514 (1977) (Stevens, J. concurring)). The Supreme Court's decision in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), sets forth the three-part analytical framework courts must apply when assessing whether a challenged zoning ordinance constitutes a constitutional time, place, and manner restriction on speech. First, is the ordinance a total ban on speech? *Id.* at 46. Second, if the restriction is not a total ban, is the ordinance content neutral or content based? *Id.* at 46–47. Finally, if the restriction is content neutral, is the ordinance designed to serve a substantial government interest that is narrowly tailored, and do reasonable alternative avenues of communication remain available? *Id.* at 47; *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984).

Here, the buffer zone regulation is clearly not a total ban on speech in light of the three tattoo shops that operate in the City.[5] (Doc. No. 5-3 ¶ 16.)[6] Thus, "it [is] properly analyzed as a time, place and manner regulation." *Ctr. for Fair Pub. Policy v. Maricopa Cnty., Ariz.*, 336 F.3d 1153, 1159 (9th Cir. 2003) (citing *Renton*, 475 U.S. at 46). The regulation is likewise clearly content neutral because it applies to all regulated uses generally and tattoo businesses specifically, without regard to the type of tattoos that are created. *See Anderson*, 621 F.3d at 1059 n.4 ("Anderson does not contend that the City's regulation is a content-based restriction on speech. And with good reason, as the City bans

_____

[5] While it is unclear where within the City these tattoo shops are located and thus whether the 1986 Ordinance controlled in those cases, each of the City's ordinances contains a buffer zone regulation with the 1986 Ordinance being the most lenient. (*Compare* Doc. No. 5-13 at 4 (200-foot buffer zone between regulated uses and residential zones) *with* Doc. No. 5-13 at 21 (500-foot buffer zone between, *inter alia*, tattooing establishment and residential district).)

[6] The relevant paragraph is mislabeled as a second paragraph 14, which can be located on pages 5 and 6 of the Ramsey declaration.

all tattoo parlors, not just those that convey a particular kind of message or subject matter."). Accordingly, the buffer zone regulation, as a content-neutral time, place, and manner restriction, is "acceptable so long as [it is] designed to serve a substantial government interest and do[es] not unreasonably limit alternative avenues of communication." *Renton*, 475 U.S. at 47.

Yvon does not argue that the buffer zone ordinances unreasonably limit alternative avenues of communication. Nor can he, given the City's evidence that there are as many as 879 prospective locations in which he could operate his tattoo shop in compliance with the regulation. (Doc. No. 10 at 2, 8.) Rather, Yvon focuses his argument exclusively on what he contends is the City's lack of a substantial government interest supported by pre-1986 evidence specifically tying tattooing businesses to harmful secondary effects. (Doc. No. 6 at 6–10; Doc. No. 11 at 3.)

The buffer zone regulation is codified in Article 15.2 of the City's 1986 Ordinance. Section 1500.21 lists those businesses that are subject to the buffer zone regulation ("regulated uses"), including tattoo shops. (Doc. No. 5-13 at 2.) Section 1500.23, the specific regulation at issue, renders it "unlawful for any regulated use to be located: (a) closer than 1,000 feet to any other regulated use; or (b) to be closer than 200 feet to any residential home."[7] (*Id.* at 4.)

The City contends its interest in enforcing the buffer zone regulation is due to the harmful secondary effects associated with the enumerated regulated uses.[8] (*See* Doc. No.

---

[7] The City requests the Court take judicial notice of provisions of the 1986 and 1992 Ordinances, as well as documents that were before the City when it adopted the 1992 Ordinances. (Doc. Nos. 5-4, 10-3.) Yvon does not oppose the City's requests. The Court **GRANTS** these requests because "[m]unicipal ordinances are proper subjects for judicial notice" under Rule 201 of the Federal Rules of Evidence. *Tollis, Inc. v. Cnty. of San Diego*, 505 F.3d 935, 938 n.1 (9th Cir. 2007).

[8] Specifically, the City points to the statement of purpose contained in its 1992 Ordinance as the statement of its interest and the evidence necessary to support it. (Doc. No. 5 at 17.) However, that statement is, in pertinent respects, identical to that contained in 1986 Ordinance, though the 1992 Ordinance is indisputably more expansive. (*Compare* Doc.

5 at 17; Doc. No. 5-13 at 1.) Specifically, section 1500.20 states,

> [I]t is recognized that there are some uses which, because of certain factors such as nature of operation, type of clientele, and hours-of-operation, create conditions harmful to the public health, welfare, and safety when such uses are allowed to become numerous or concentrated within a limited geographical area, or when such uses exist near residential neighborhoods. Special regulations separating such uses from each other and from nearby residential areas are therefore necessary to protect the community from consequent blight, depreciated property values, law enforcement problems, and interference with residential neighborhoods.

(Doc. No. 5-13 at 1.) This interest is certainly a substantial governmental interest in light of the many binding judicial opinions finding similarly stated interests to be so. *See, e.g.*, *Members of City Council of L.A.*, 466 U.S. at 807–08 (city's interest to combat "visual clutter and blight" was substantial); *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976) ("the city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect"); *Ctr. for Fair Pub. Policy*, 336 F.3d at 1166 ("It is beyond peradventure at this point in the development of the doctrine that a state's interest in curbing the secondary effects associated with adult entertainment establishments is substantial."). In light of this authority, Yvon levels his attacks at whether the City's proffered evidence "demonstrate[s] a connection between [tattooing businesses] . . . and the secondary effects that motivated the adoption of the ordinance." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 441 (2002) (O'Connor, J., plurality).[9] (*See* Doc. No. 6 at 6–10.)

A municipality that seeks to combat the secondary effects of protected speech carries the initial burden of coming forth with "any evidence that is 'reasonably believed to be

---

No. 5-13 at 1 *with* Doc. No. 5-13 at 11.) As the 1986 Ordinance is the permitting scheme that currently controls in the relevant zone, the Court cites to its statement of purpose.

[9] While the Ninth Circuit has recognized Justice Kennedy's opinion as the controlling opinion in *Alameda Books*, it also acknowledged that the differences between the two opinions are "quite subtle." *Ctr. for Fair Pub. Policy*, 336 F.3d at 1161, 1163 (quoting *Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702, 721 (7th Cir. 2003)).

relevant' for demonstrating a connection between speech and a substantial, independent government interest." *Alameda Books*, 535 U.S. at 438 (O'Connor, J., plurality) (quoting *Renton*, 475 U.S. at 51–52). This burden is not a "high bar." *Id.* Rather, the "evidence must fairly support the municipality's rationale for its ordinance." *Id.* If the municipality meets this bar, the burden then shifts to the plaintiff to cast direct doubt on the municipality's rationale, "either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings[.]" *Id.* at 438–39. If the plaintiff fails to cast this doubt, then the municipality has carried its burden under *Renton*. *Id.* If, however, the plaintiff succeeds in casting doubt, "the burden then shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies the ordinance." *Id.* at 439. It is only when the burden shifts back to the municipality that it may rely on post-enactment evidence. *Ctr. for Fair Pub. Policy*, 336 F.3d at 1166 n.3 (citing *Alameda Books*, 535 U.S. at 441).

Here, the City contends it has met its burden by presenting findings made in support of the 1992 Ordinance. (Doc. No. 5 at 17; Doc. No. 10 at 5–7.) However, the Court finds this evidence fails to satisfy the City's initial burden of proving a connection between tattooing businesses and its stated governmental interest. The issues with the City's evidence are twofold. First, the City relies wholly upon post-enactment evidence. The Ninth Circuit recently clarified the role post-enactment evidence plays in the analysis:

> The parties argue at great length over whether or not we may consider the contents of the studies that document the secondary effects associated with sexually-oriented businesses, and that were placed in the district court record during the course of these proceedings. While the Arizona legislature was briefed on these studies, the actual studies themselves were not before the legislature prior to § 13-1422's enactment, and it is therefore so-called post-enactment evidence. However, in *Alameda Books* the Supreme Court specifically contemplated that the state could indeed rely on post-enactment evidence in support of its position, *but only* if the plaintiffs succeed in casting doubt on the state's rationale. *See Alameda Books*, 535 U.S. at 441 (if "the burden shifts back" to the state, then state can "*supplement* the record with evidence renewing support for a theory that justifies the ordinance" (emphasis added))[.]

9

*Ctr. for Fair. Pub. Policy*, 336 F.3d at 1166 n.3. Because the City can rely on post-enactment evidence to support its position only after the burden has shifted back to it, the City is necessarily required to rely on pre-enactment evidence to carry its initial burden. *See Buehrle v. City of Key West*, 813 F.3d 973, 979 (11th Cir. 2015) (stating city "must demonstrate that it had a reasonable basis for believing its regulation would further [its] legitimate interests" and "'must rely on at least *some* pre-enactment evidence' that the regulation would serve its asserted interests" (quoting *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty.*, 337 F.3d 1251, 1268 (11th Cir. 2003))).

Second, the evidence the City has proffered says nothing that ties *tattooing* itself to the secondary effects that the City seeks to avoid. The findings contained in the 1992 Ordinance either refer to "adult businesses" generally or "sexually oriented businesses" specifically. (Doc. No. 5-13 at 11–13.) The closest that the 1992 Ordinance comes to commenting on tattooing businesses is by stating, rather generally, that "the location and concentration of certain businesses other than adult businesses also create conditions harmful to the public health, welfare, and safety, due to the nature of their operations, types of clientele, and hours of operation." (*Id.* at 13.)

The accompanying Staff Report does no better. It mentions tattooing specifically only to clarify that the proposed amendments include adding a definition for "tattooing establishments" because it was "omitted from the prior ordinance[.]" (Doc. No. 10-7 at 2.) Otherwise, the Staff Report largely focuses on the secondary effects of sexually-oriented businesses, as supported by "the report on the Attorney General's working group on the regulation of sexually oriented businesses[.]"[10] (Doc. No. 10-9 at 3.) It is true that the Staff

_____

[10] The Staff Report also relied upon land use study results from six cities. (Doc. No. 10-9 at 3.) The Staff Report does not inform whether these studies explicitly noted secondary effects that arise from tattooing businesses or if they more specifically addressed sexually-oriented business; rather, the Staff Report merely states that "the studies document the secondary adverse [e]ffects of adult-oriented businesses . . . ." (*Id.*) The City did not provide the Court with a copy of these studies.

Report advised that the buffer zone for all regulated uses other than adult book stores, adult entertainment businesses, adult motion picture theaters, adult theaters, and peep show establishments be increased from 200 feet to 500 feet from any residential district. (Doc. No. 10-8 at 16.) While the Court acknowledges that this recommendation applied to "all the other regulated uses that are listed in Article 36," the Staff Report failed to mention tattooing establishments, though it listed a host of other regulated uses. (Doc. No. 10-8 at 16 (noting the recommendation to increase the buffer zone applied to "bars and cocktail lounges, bath houses, dance establishments, escort services, figure studios, liquor stores, massage establishments, peep-show establishments and pool rooms").)

The Court is cognizant that the burden the City bears is not a high bar. While an attack on the buffer zone regulation contained in the 1992 Ordinance as it applies to sexually-oriented businesses would likely pass constitutional muster based upon the evidentiary record before the Court, that is not what Yvon attacks here. *See Gammoh v. City of La Habra*, 395 F.3d 1114, 1126 (9th Cir. 2005) (characterizing the pre-enactment record as "substantial" and carried the city's initial burden because the city council was presented with, *inter alia*, "seventeen studios on secondary effects of adult businesses, a summary of some of those studies, [and] the 1986 Attorney General's Report on Pornography"). Rather, he levels his constitutional challenge against the buffer zone regulation contained in the 1986 Ordinance as it applies to tattoo shops. Against *this* challenge, the City has not carried its burden. Accordingly, the Court finds that Yvon has established a likelihood of success on the merits with respect to the buffer zone regulation contained in the 1986 Ordinance.

## C.    Conditional Use Permit Regulation

The Supreme Court has repeatedly held an ordinance that "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *FW/PBS*, 493 U.S. at 226 (O'Connor, J.,

16-CV-1640-AJB-WVG

plurality) (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)). "The reasoning is simple: If the permit scheme 'involves appraisal of facts, the exercise of judgment, and the formation of an opinion,' *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940), by the licensing authority, 'the danger of censorship and of abridgment of our precious First Amendment freedoms is too great' to be permitted, *S.E. Promotions, Ltd.*, 420 U.S. at 553." *Forsyth Cnty., Ga.*, 505 U.S. at 131. Although prior restraints are not unconstitutional *per se*, any system of prior restraint bears "a heavy presumption against its constitutional validity." *FW/PBS*, 493 U.S. at 225 (O'Connor, J., plurality) (quoting *S.E. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 562 (1975)).

To avoid this adverse presumption, a permitting scheme that acts as a prior restraint must contain certain procedural safeguards to guard against the government's possible abuse of power to censor. First, the permitting scheme must not grant officials unbridled discretion to deny an applicant to speak. *Id.* at 225–26. Second, it must "place limits on the time within which the decisionmaker must issue the license . . . ." *Id.* at 226. Finally, the scheme must provide for expeditious judicial review. *Freedman v. State of Maryland*, 380 U.S. 51, 58–60 (1965).[11]

The CUP regulation is codified in Article 15 of the City's 1986 Ordinance. Section 1501 requires a CUP applicant to show, *inter alia*, that (a) "the proposed use . . . is necessary or desirable to provide a service or facility which will contribute to the general well being of the neighborhood or community"; and (b) "such use will not . . . be

---

[11] As explained *infra*, the Court finds the CUP regulation to be an unconstitutional prior restraint because it fails to constrain City officials' discretion in granting or denying applications. Accordingly, the Court need not reach the issue of whether the safeguard requiring the City to "bear the burden of going to court to suppress the speech and [] bear the burden of proof once in court" applies, which was the core contention between the plurality opinions in *FW/PBS*, 493 U.S. at 228. *Compare id.* at 238–39 (Brennan, J., concurring) ("I write separately [] because I believe that our decision two Terms ago in *Riley v. National Federation of Blind of N.C., Inc.*, 487 U.S. 781 (1988), mandates application of all three of the procedural safeguards specified in *Freedman v. Maryland*, 380 U.S. 51 (1965), not just two of them").

detrimental to the health, safety, peace or general welfare of persons residing or working in the vicinity." (Doc. No. 5-12 at 3.) Yvon levels his most vicious attack against these particular subsections, arguing that consideration of these factors vests unbridled discretion in City officials. (Doc. No. 3-1 at 9–12.) As support, Yvon points to opinions rendered by other courts, including the Supreme Court, that have struck down as unconstitutional prior restraints regulations containing language nearly identical to section 1500(b).[12] (*Id.* at 10–11.) The City argues that the CUP regulation is not a prior restraint because City officials exercise no discretion.[13] [14] (Doc. No. 5 at 23–25.)

---

[12] Yvon also argues that the CUP regulation does not contain the requisite procedural safeguards. (Doc. No. 3-1 at 12–13; Doc. No. 6 at 11.) Because the Court concludes that section 1500 is an unconstitutional prior restraint for vesting unbridled discretion with City officials, and because this conclusion is sufficient, on its own, to support granting Yvon's motion for preliminary injunction as to the CUP regulation, the Court need not reach Yvon's alternative argument. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 771 (1988) ("Even if judicial review were relatively speedy, such review cannot substitute for concrete standards to guide the decision-maker's discretion."). *Cf. Burbridge v. Sampson*, 74 F. Supp. 2d 940, 953 (C.D. Cal. 1999) ("Because the Court concludes that the Policy's approval and denial process . . . fails to provide adequate procedural safeguards, the Court need not reach Plaintiffs' other arguments [including the argument that the licensing scheme vests college officials with unbridled discretion] at this time.").

[13] The City also contends that the *Renton* analysis applies to the CUP regulation because it is a content-neutral time, place, and manner restriction. (Doc. No. 5 at 22–23.) However, the Court need not undertake a *Renton* analysis with respect to the CUP regulation because it fails at the basic hurdle of constituting an unconstitutional prior restraint, even if it is a content-neutral time, place, and manner restriction. *See Diamond v. City of Taft*, 29 F. Supp. 2d 633, 647 (E.D. Cal. 1998) ("The weight of authority suggests that an unconstitutional prior restraint cannot be upheld as a 'content-neutral time, place and manner regulation."); *see also FW/PBS*, 493 U.S. at 223 ("Because we conclude that the city's licensing scheme lacks adequate procedural safeguards we do not reach the issue decided by the Court of Appeals whether the ordinance is properly viewed as a content-neutral time, place, and manner restriction").

[14] The City also argues that the CUP regulation contains adequate time limits and means for expeditious judicial review. (Doc. No. 5 at 25–26.) As explained *supra*, the Court need not reach the issue of whether the CUP regulation fails to place specified brief time limits on when a decision must be rendered. *See supra* note 12. However, the Court notes, and

In *Staub v. City of Baxley*, the Supreme Court struck down a law that predicated a CUP's issuance on whether the mayor and city council determined the proposed use to adversely affect the "general welfare" of the citizenry. 355 U.S. 318, 322 (1958). Similarly, in *Shuttlesworth*, the relevant statute provided that the government official would refuse to issue a CUP if the proposed use threatened "the public welfare, peace, safety, health, decency, good order, morals or convenience" of the community. 394 U.S. at 149–51. The Supreme Court found this ordinance vested "virtually unbridled and absolute power" in the city commission and consequently held it unconstitutional. *Id.* at 150.

Like the ordinances at issue in *Staub* and *Shuttlesworth*, the CUP regulation here vests City officials with unbridled discretion to grant or deny a CUP application based upon the applicant's ability to show, among other things, that the suggested use will not "be detrimental to the health, safety, peace or general welfare of persons residing or working in the vicinity." (Doc. No. 5-12 at 3.) As the district court in *Dease* concluded, City officials' "ability to make decisions based on ambiguous criteria such as the 'general welfare' of the community effectively gives [them] the power to make decisions on any basis at all, including an impermissible basis, such as content-based regulation of speech." 826 F. Supp. at 344. Because the CUP regulation does not, on its face or as defined by a California state appellate court,[15] provide "narrow, objective, and definite standards" to guide City officials' decisional process, the Court finds Yvon has carried his burden of showing a likelihood of success on the issue of whether the CUP regulation infringes upon applicants' First Amendment rights. *Shuttlesworth*, 394 U.S. at 150–51 ("[I]n deciding whether or not to withhold a permit, the members of the Commission were to be guided

_____

the City itself concedes, there is no explicit time constraint included in the 1986 Ordinance. (Doc. No. 5 at 25.)

[15] *See In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010) ("We 'must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently.'" (quoting *Owen By & Through Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983))).

14

only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.' This ordinance as it was written, therefore, fell squarely within the ambit of the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional."); *3570 E. Foothill Blvd., Inc.*, 912 F. Supp. at 1274–75 (finding it "clear that the Pasadena [CUP] ordinances confer excessive substantive discretion on licensing authorities," thus permanently enjoining ordinance that permitted city officials to deny a CUP "if the proposed use would be 'detrimental to the public health, safety, or welfare of persons residing or working adjacent to the neighborhood of such use, or injurious to properties or improvements in the vicinity'").[16]

--------------------

[16] The City's arguments to the contrary do not alter the Court's conclusion. The City argues that City officials exercise no discretion because all CUP applications "are subject to sound land-use guidelines[, a]nd with respect to the nature of a tattoo parlor as a Regulated Use, the additional Locational Requirements . . . that apply are non-discretionary and uniformly applied unless the project applicant seeks a waiver of those standards." (Doc. No. 5 at 24.) Yet this contention does nothing to dispute that section 1500(b) requires consideration of whether the proposed "use will . . . be detrimental to the health, safety, peace or general welfare of persons residing or working in the vicinity," (Doc. No. 5-12 at 3), language that many other courts have struck down for vesting unbridled discretion in government officials. *See, e.g., Shuttlesworth*, 394 U.S. at 150–51; *3570 E. Foothill Blvd., Inc.*, 912 F. Supp. at 1274–75; *Dease*, 826 F. Supp. at 344.

The City's argument that "City Staff recommends approval or denial of . . . [CUP] applications to the City Council based upon objective criteria in the zoning ordinances" is similarly unavailing. (Doc. No. 10 at 10.) For this proposition, the City relies on the assertion of William Ramsey, the City's lead planner managing the processing of Yvon's pending applications, that he is "informed and believe[s] that the City Planner has interpreted the provisions of the [relevant] zoning ordinances . . . to mean that objective criteria or guidelines are to be used in processing applications involving regulated uses with First Amendment considerations." (Doc. No. 10-1 ¶¶ 16, 19.) Yet, neither the City nor Ramsey provide any insight into what these objective criteria could be. *See, e.g., City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 783 (2004) (noting the ordinance at issue contained "reasonably objective, nondiscretionary criteria" to guide the decisional process, including whether the applicant is underage; has had an adult business license

**D.    Severability**

The City contends that even if the Court finds the CUP regulation to be unconstitutional, the entire zoning ordinance scheme need not be enjoined because section 1501 is severable. (Doc. No. 10 at 10–11.) Yvon does not address this argument.

"The standard for determining the severability of an unconstitutional provision is well established: Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (citation and internal quotation marks omitted). A constitutionally flawed provision cannot be severed "if the balance of the legislation is incapable of functioning independently." *Id.*

Having reviewed the 1986 Ordinance, the Court agrees that the buffer zone and CUP regulations are severable from the majority of what remains.[17] As to the CUP regulation, sections 1502 through 1506 both necessarily rely upon section 1501 and thus cannot be severed from it. *See Dease*, 826 F. Supp. at 345 ("[T]he court has found that the conditions for obtaining a CUP . . . are unconstitutional. Consequently, all other statutory references to the CUP ordinance are effectively rendered moot."). Accordingly, these sections are also subject to preliminary injunction. As to the buffer zone regulation, the Court finds that the entire Article 15.2 is subject to preliminary injunction because "it is evident that the Legislature would not have enacted those provisions which are within its power,

---

revoked or suspended within the past year; or has been convicted of certain crimes within the past five years).

[17] The Court notes this result is consistent with the severance clause contained in the 1986 Ordinance, codified at section 1500.26 of Article 15.2, which provides that, "[i]f any section, sentence, clause, or phrase of this ordinance is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining sections, sentences, clauses, or phrases of this ordinance, or the ordinance as an entirety, it being the legislative intent that this ordinance shall strand [*sic*] notwithstanding the invalidity of such section, sentence, clause, or phrase." (Doc. No. 5-13 at 5.)

16

independently of that which is not . . . ." *Alaska Airlines, Inc.*, 480 U.S. at 684. Specifically, it appears that the only reason to identify regulated uses in section 1500.21 and define them in section 1500.22 is to subject those businesses to the buffer zone regulation contained in section 1500.23. Accordingly, while Article 15.2 may be severed from the rest of the 1986 Ordinance, section 1500.23 cannot be severed from the remainder of Article 15.2.

In sum, should a preliminary injunction issue, sections 1501 through 1506, contained in Article 15 of the 1986 Ordinance, as well as the entire Article 15.2 of the 1986 Ordinance, are subject to injunction. The remainder of the 1986 Ordinance is not.

## II.   Irreparable Harm

"[P]reliminary injunctive relief is available only if plaintiffs 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'" *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 22). If the harm to the plaintiff is merely monetary, it "will not usually support injunctive relief." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009).

As discussed above, the Court finds that Yvon has established a likelihood that he will succeed on the merits of his case. That being so, Yvon's First Amendment freedoms, as well as any other member of the public who wishes to operate a regulated use in the coastal zone of the City of Oceanside, "are in danger of impairment if a preliminary injunction does not issue to enjoin" the City from applying the buffer zone and CUP regulations. *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 737 (C.D. Cal. 1996). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "[T]he duration of a trial is an 'intolerably long' period during which to permit the continuing impairment of First Amendment rights." *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1058 (9th Cir. 1995) (citation omitted). Accordingly, the Court finds that Yvon has established irreparable harm in the absence of preliminary injunctive relief.

## III.   Balance of Equities

The balance of equities inquiry requires the Court to "balance the competing claims

17

of injury and [to] consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987). If a preliminary injunction does not issue, Yvon will be deprived of his First Amendment rights until trial on the merits. In contrast, based upon the record before the Court, there is no indication that the City has any legitimate compelling interest—let alone a fundamental constitutional right like Yvon's—that will be adversely affected if a preliminary injunction does issue.[18] As such, the Court finds that the balance of equities favors Yvon. *See Baca*, 936 F. Supp. at 737 (same).

## IV.   *Public Interest*

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "The public interest analysis for the issuance of a preliminary injunction requires [the Court] to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Alliance for the Wild Rockies*, 632 F.3d at 1138 (quoting *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1114–15 (9th Cir. 2010)). On one hand, the buffer zone and CUP regulations affect not only Yvon's fundamental First Amendment rights, but also those of any member of the public who may wish to operate a regulated use in the coastal zone of the City of Oceanside. On the other hand, there is documented opposition to Yvon's operation of a tattoo shop at his desired location by some residents, tenants, and business owners proximately located to his chosen site. (Doc. No. 5-6 at 14.) Given that Yvon's fundamental constitutional rights hang in the balance, the Court finds this factor weighs marginally in favor of the issuance of a preliminary injunction.

---

[18] The City argues this factor weighs in its favor because the Court must not only consider the party's interests in the litigation, but also that of the public. (Doc. No. 5 at 19–20.) However, the balance of equities inquiry requires balancing the effect of granting or withholding an injunction on the *parties*. Furthermore, the public's interest is a separate factor under the preliminary injunction test, so the Court will consider it separately.

## CONCLUSION

In sum, Yvon has made a strong showing on three of the four preliminary injunction factors. This strong showing "offset[s the] weaker showing" on the public interest factor. *Alliance for the Wild Rockies*, 632 F.3d at 1131. The Court therefore **GRANTS** Yvon's motion for preliminary injunction, (Doc. No. 3), and **ORDERS** that the City be preliminary enjoined from enforcing the buffer zone and CUP regulations, and the related sections, contained in the 1986 Ordinance, specifically, sections 1501 through 1506 of Article 15 and the entire Article 15.2. However, the City has proffered evidence that it has recently undertaken efforts to make the 1992 Ordinance applicable in the coastal zone. (Doc. No. 5-2 ¶ 5.) In light of this information, the Court **STAYS** implementation of the preliminary injunction until ***October 14, 2016***, to allow the City time to take appropriate action in light of the Court's ruling. The Court **ORDERS** the City to provide written notice to the Court and Yvon of any official action it takes prior to the injunction's implementation, at which time pleadings and claims may be amended as necessary.

**IT IS SO ORDERED.**

Dated:  August 11, 2016

Hon. Anthony J. Battaglia
United States District Judge

19

16-CV-1640-AJB-WVG